UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Case: 1:21-mj-00240 |
| : | Assigned to: Judge Harvey, G. Michael |
| : | Assign Date: 2/17/2021 |
| : | Description: COMPLAINT W/ARREST WARRANT |
| v.       : | |
| : | **UNDER SEAL** |
| **EMMA CORONEL AISPURO,** : | |
| : | |
| **Defendant.** : | |
| : | |

**AFFIDAVIT OF SPECIAL AGENT ERIC S. MCGUIRE IN SUPPORT OF
AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Eric S. McGuire, being duly sworn, hereby depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since February 2010. I have been the lead agent for investigations targeting global criminal organizations. I have testified during an array of judicial proceedings, conducted physical and electronic surveillance, administered confidential sources, and received training as investigative techniques evolve. I have interviewed hundreds of defendants, witnesses, and informants who have direct knowledge of international contraband smuggling and money laundering.

2. As a law enforcement officer defined within Section 2510(7) of Title 18, United States Code, I am empowered by law to conduct investigations and make arrests for, but not limited to, offenses enumerated in Title 18, Title 21, and Title 46 of the United States Code.

3. This affidavit is submitted for the limited purpose of establishing probable cause in

1

support of a Criminal Complaint charging EMMA CORNEL AISPURO (hereinafter, "CORONEL"), with conspiring to knowingly and intentionally distribute one (1) kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance; five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; one thousand (1000) kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance; and five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, knowing and intending that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(A), 960(b)(1)(B)(ii), 1960(b)(1)(G), and 960(b)(1)(H); all in violation of 21 U.S.C. § 963 and 18 U.S.C. § 2.

4. It is unlawful "to manufacture or distribute a controlled substance in schedule I or II . . . intending, knowing, or having reasonable cause to believe that such substance . . . will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States." 21 U.S.C. § 959(a). Pursuant to 21 U.S.C. § 963, "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Further, pursuant to 18 U.S.C. § 2, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

5. Additionally, 21 U.S.C. § 959(c), establishes that Section 959 is "intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United

States." Pursuant to 18 U.S.C. § 3238, there is statutory venue in the District of Columbia for "all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district" where the defendant has no last known residence in the United States.

6.     The information contained within this affidavit is based upon my own investigation and upon information provided to me by other law enforcement officers. Where conversations or statements of others are related herein, they are related in substance and in part. In some instances, the communications described in this affidavit were originally made in Spanish; in those cases, my knowledge is derived from draft English translations. Moreover, because this affidavit is submitted for a limited purpose, I have not set forth every fact that I have learned in the course of the investigation.

## PROBABLE CAUSE

### A. The Drug Trafficking Activities of the Sinaloa Cartel

7.     The FBI and the Criminal Division's Narcotic and Dangerous Drug Section have investigated high-ranking members of the international drug trafficking organization known as the "Sinaloa Cartel," including but not limited to JOAQUIN GUZMAN LOERA, also known as "El Chapo" (hereinafter, "GUZMAN"), ISMAEL ZAMBADA GARCIA, also known as "El Mayo" (hereinafter, "ZAMBADA"), DAMASO LOPEZ NUNEZ also known as "Licenciado" (hereinafter "LOPEZ NUNEZ") GUZMAN'S sons IVAN ARCHIVALDO GUZMAN SALAZAR, also known as "Menor" (hereinafter, "IVAN"), JESUS ALFREDO GUZMAN SALAZAR, also known as "Tocayo"    (hereinafter, "ALFREDO"), OVIDIO GUZMAN LOPEZ, also known as "Raton" (hereinafter, "OVIDIO"), and JOAQUIN GUZMAN LOPEZ, also known as "Guerro" (hereinafter, "JOAQUIN").

3

8.      As part of this investigation, I have debriefed more than one hundred members, former members, and associates of the Sinaloa Cartel, including but not limited to a high-ranking associate of GUZMAN referred to herein as "Cooperating Witness 1,"[1] whom I have debriefed personally on dozens of occasions about the drug trafficking and other activities of the Sinaloa Cartel and its members, including GUZMAN, his sons, ZAMBADA, and CORONEL. I have also reviewed thousands of intercepted wire and electronic communications relating to the Sinaloa Cartel's drug trafficking activities.

9.      On June 1, 2001, the Office of Foreign Asset Control ("OFAC"), U.S. Department of the Treasury, designated GUZMAN as a "significant foreign narcotics trafficker" pursuant to the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act"), 21 U.S.C. § 1901 *et seq.* OFAC likewise so-designated ZAMBADA on May 31, 2002 and the Sinaloa Cartel itself on April 15, 2009.  OFAC then designated ZAMBADA's son, VICENTE ZAMBADA NIEBLA (hereinafter, "VICENTE"), on May 17, 2007, and then GUZMAN's sons, IVAN and OVIDIO on May 8, 2012; and ALFREDO on June 7, 2012.

10.     I know from my investigation that GUZMAN and ZAMBADA were the co-leaders of the Sinaloa Cartel from 1989 to 2016. From 2001 to 2016, GUZMAN and ZAMBADA formed the most prolific drug trafficking partnership in the world. They controlled drug trafficking routes from South America to the United States, importing tons of cocaine, heroin, methamphetamine, and marijuana. Furthermore, GUZMAN and ZAMBADA created an umbrella of security and

---

[1] Cooperating Witness 1 pleaded guilty to one count of conspiracy to distribute five kilograms or more of cocaine for unlawful importation into the United States, in violation of 21 U.S.C. § 963, for his/her role in the drug trafficking activities of the Sinaloa Cartel.   He/she agreed to cooperate with the government in exchange for a potential reduction in sentence.

4

corruption that permitted other drug traffickers to operate throughout Mexico.

11. A second Cooperating Witness (hereinafter "Cooperating Witness 2") proffered that he/she provided members of the Sinaloa Cartel, to include GUZMAN, ZAMBADA, VICENTE, IVAN, ALFREDO, LOPEZ NUNEZ, and others with more than 100 tons of cocaine. Despite being a prolific drug trafficker, he/she always informed potential business associates that he/she worked for GUZMAN and ZAMBADA to ensure his/her protection.

12. GUZMAN was arrested and extradited to the United States on January 19, 2017.Following extradition to the United States, GUZMAN faced trial in the U.S. District Court for the Eastern District of New York on beginning on November 13, 2018. On February 12, 2019, a jury found GUZMAN guilty often counts, including a lead charge of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. On July 17, 2019, GUZMAN was sentenced to life in prison plus 30 years as a result of his conviction.

### B. CORONEL's Activities in Furtherance of the Sinaloa Cartel's Drug Trafficking Activities

13. The FBI has confirmed through confidential sources and government databases that CORONEL was born on July 3, 1989 in California. CORONEL is a citizen of the United States and Mexico. I know from my investigation that CORONEL resides in Mexico.

14. I know from my investigation that CORONEL married GUZMAN in or about 2007. I know that CORONEL's family had a historical friendship with GUZMAN. CORONEL and GUZMAN have twin daughters together.

15. Based on my knowledge of the investigation and debriefing of former Sinaloa Cartel members, CORONEL's father, INES CORONEL BARRERAS (hereinafter, "INES CORONEL") was a member of the Sinaloa Cartel. On January 9, 2013, OFAC designated INES

CORONEL as a "significant foreign narcotics trafficker" pursuant to the Foreign Narcotics Kingpin Designation Act for his involvement in the drug trafficking activities of the Sinaloa Cartel and with GUZMAN and ZAMBADA.

16. Based on information received from Mexican law enforcement, I know that INES CORONEL and his son, INES OMAR CORONEL AISPURO, were arrested in Sonora, Mexico, on April 13, 2013 on narcotics and firearms charges. On April 28, 2017, a Mexican court sentenced INES CORONEL to more than ten years in prison for marijuana trafficking and firearms violations. INES OMAR CORONEL AISPURO was also sentenced to more than ten years in prison for marijuana trafficking.

17. According to Cooperating Witness 1, CORONEL knew that GUZMAN was a leader of the Sinaloa Cartel and that GUZMAN coordinated the distribution of heroin, cocaine, methamphetamines, and marijuana for the purpose of unlawfully smuggling those narcotics into the United States for distribution.

18. According to Cooperating Witness 1, CORONEL also knew that GUZMAN's sons, IVAN, OVIDIO, ALFREDO, and JOAQUIN, are also high-ranking members of the Sinaloa Cartel. CORONEL further knew that her father, INES CORONEL, coordinated narcotics transports for GUZMAN.

19. CORONEL grew up with knowledge of the narcotics trafficking industry, and married GUZMAN when she was a teenager. Based upon my investigation, I know CORONEL understood the scope of the Sinaloa Cartel's drug trafficking. CORONEL knows and understands the Sinaloa Cartel is the most prolific cartel in Mexico. CORONEL was aware of multi-ton cocaine shipments, multi-kilo heroin production, multi-ton marijuana shipments, and ton quantity

6

methamphetamine shipments. CORONEL understood the drug proceeds she controlled during her marriage to GUZMAN were derived from these shipments. Furthermore, from 2012 to 2014, CORONEL relayed messages on behalf of GUZMAN in furtherance of drug trafficking activities while GUZMAN attempted to avoid capture by Mexican authorities. Once GUZMAN was arrested in February 2014, CORONEL continued to deliver messages she received from GUZMAN during her prison visits, which were not monitored by Mexican authorities.

20.  I have reviewed a handwritten letter written and signed by GUZMAN. This letter was authenticated by multiple witnesses, including Cooperating Witness 1, and is currently maintained in FBI evidence control. The letter states, in pertinent part:

> Regarding Cleto, increase the production so that it yields. Say hi to Cleto. Tell him to please give me a hand, so that the first sale will be my part… because I have a lot of expenses here.

21.  I know from my investigation that "Cleto" is a drug trafficker based in Durango, Mexico who produces heroin. I know from Cooperating Witness 1 as well as other sources that Cleto produced heroin for GUZMAN. I know GUZMAN's reference to "expenses here" was a reminder to the recipient of the letter that GUZMAN had to pay bribes inside the prison and also continue to support his family. I know from my investigation that Cleto and Cooperating Witness 1 provided CORONEL drug proceeds from more than 5 kilograms of heroin.

**C.  CORONEL's Participation in GUZMAN's Escape from Prison**

22.  Based on my knowledge of the investigation and debriefing of multiple former Sinaloa Cartel members, CORONEL visited GUZMAN at Altiplano prison on multiple occasions following GUZMAN's arrest on February 22, 2014.

23.  I have reviewed a handwritten letter written and signed by GUZMAN. This letter

7

was authenticated by multiple witnesses and is currently maintained in FBI evidence control. The letter contains detailed instructions about the ongoing operations of the Sinaloa Cartel, including narcotics transports. The letter also states, in pertinent part:

> I ask you to always be in agreement among you and my four sons. Hire accountants throughout the state, and pay the guys and widows from there, and whatever is left per month, half is for you and half for the four of them.
>
> . . . You know who has the papers from that place. Send them to the twins please. The twins' mother will tell you and my children something. Please be alert, compadre. She will explain.
>
> . . . The twins' mother will bring a message to all of you, so that you all see it personally.

Based on my knowledge of the investigation, I understand "my four sons" to be IVAN, ALFREDO, OVIDIO, and JOAQUIN, and I understand "[t]he twins' mother" to be CORONEL. Based on the letter quoted above and my knowledge of the investigation, I believe that CORONEL was acting as a go-between and messenger between GUZMAN and his lieutenants, associates, and sons. I further understand that GUZMAN continued to direct the drug trafficking activities of the Sinaloa Cartel from Altiplano prison through a number of individuals, including CORONEL.

24.   According to Cooperating Witness 1, he/she received communications from CORONEL on behalf of GUZMAN while GUZMAN was detained in Altiplano prison in 2014 and 2015. Furthermore, Cooperating Witness 1 told me CORONEL agreed to help facilitate GUZMAN to escape from Altiplano via an underground tunnel.

25.   According to Cooperating Witness 1, CORONEL met with him/her and asked for assistance with GUZMAN's escape from Altiplano prison. Cooperating Witness 1 agreed to assist. Later, CORONEL met with Cooperating Witness 1, IVAN, ALFREDO, OVIDIO, and JOAQUIN and communicated GUZMAN's instructions regarding the escape plan to them.

8

During the meeting, CORONEL, IVAN, ALFREDO, OVIDIO, and Cooperating Witness 1 agreed to organize the construction of an underground tunnel linked to Altiplano in order to facilitate GUZMAN's escape from prison. Cooperating Witness 1, CORONEL, IVAN, ALFREDO, and OVIDIO all understood that the purpose of facilitating GUZMAN's escape was to prevent GUZMAN's extradition to the United States and to ensure his continued control over the Sinaloa Cartel and its drug trafficking activities.

26. According to Cooperating Witness 1, GUZMAN, through CORONEL, asked GUZMAN's sons to purchase a piece of land near Altiplano prison and instructed Cooperating Witness 1 to purchase a warehouse near Altiplano prison as well as firearms and an armored truck. Those present also discussed the need to get a GPS watch to GUZMAN in prison in order to pinpoint his exact whereabouts so as to construct the tunnel with an entry point accessible to him.

27. According to Cooperating Witness 1, he/she later met with CORONEL, IVAN, ALFREDO, and OVIDIO to discuss the Altiplano prison escape plan. Cooperating Witness 1, IVAN, ALFREDO, and OVIDIO provided updates to CORONEL to pass on to GUZMAN.

28. According to Cooperating Witness 1, he/she again met with GUZMAN's sons to discuss the escape plan. GUZMAN's sons reported that GUZMAN could hear the tunnel construction and that the escape would be on a Saturday or Sunday because there are no officials or visitors at the jail on those days.

29. According to Mexican authorities, on July 11, 2015, GUZMAN escaped from Altiplano prison via an underground tunnel with an entry under the shower in GUZMAN's cell.

**D. CORONEL's Participation in GUZMAN's Attempted Escape from Prison**

30. Based on my investigation, I know GUZMAN remained a fugitive until he was

arrested again by Mexican authorities on January 8, 2016 in Los Mochis, Sinaloa, Mexico. I further know that while he was a fugitive, he continued to lead the Sinaloa Cartel with ZAMBADA, including the distribution of heroin, cocaine, methamphetamines, and marijuana and the transportation of those narcotics to the United States for further distribution.

31. Following his January 8, 2016 arrest, the United States again formally requested extradition of GUZMAN to face charges in multiple U.S. District Courts. GUZMAN again was detained in Altiplano prison pending extradition proceedings.

32. According to Cooperating Witness 1, approximately one month after GUZMAN's January 8, 2016 arrest and detention, he/she met with CORONEL. CORONEL told Cooperating Witness 1 that GUZMAN again wanted to escape and wanted to know whether Cooperating Witness 1 again would assist in the escape. Cooperating Witness 1 agreed.

33. According to Cooperating Witness 1, at a later meeting with CORONEL, CORONEL provided Cooperating Witness 1 with approximately $100,000 and instructed him/her to arrange for the purchase of real property in the vicinity of Altiplano prison. CORONEL also told Cooperating Witness 1 that he/she would receive additional funds depending on the eventual cost of purchasing the real property. Cooperating Witness 1 eventually received a total of approximately $1 million in furtherance of this escape plan.

34. According to Cooperating Witness 1, GUZMAN thereafter was transferred from Altiplano prison to a facility in Ciudad Juarez.

35. After GUZMAN's transfer, according to Cooperating Witness 1, CORONEL told him/her that she and others were trying to facilitate GUZMAN's transfer back to Altiplano prison where an escape would be possible. CORONEL stated to Cooperating Witness 1 that

10

approximately $2 million had been paid to the Mexican official who oversaw the Mexican prisons to facilitate the transfer.

36.     I know based on my knowledge of the investigation and information from Mexican authorities, that GUZMAN was never transferred out of the prison at Ciudad Juarez and that he was extradited to the United States from that facility on January 19, 2017.

## **CONCLUSION**

37.     Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, from at least in or about 2014 and at least on or about January 19, 2017, CORONEL did knowingly, intentionally, and willfully conspired with GUZMAN and others to distribute one (1) kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance; five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; one thousand (1000) kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance; and five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, knowing and intending that such substance would be unlawfully imported into the United States, in violation of

//
//
//
//
//

21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(A), 960(b)(1)(B)(ii), 1960(b)(1)(G), and 960(b)(1)(H);

all in violation of 21 U.S.C. § 963.

_____
ERIC S. MCGUIRE
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me telephonically
this  17th  day of February, 2021,
at Washington, DC.

_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA